RETROFIT PARTNERS I, L.P. and
Advanced Executive Aircraft,
Inc., Plaintiffs,

v.

LUCAS INDUSTRIES, INC., Defendant.

No. 3:96 CV 1732(GLG).

United States District Court,
D. Connecticut.

March 30, 1999.

David L. Belt, William M. Bloss, Jacobs, Grudberg, Belt & Dow, P.C., New Haven, CT, for plaintiffs.

Lori J. Kremidas, Elizabeth D. Ward, Dechert Price & Rhoads, Hartford, CT, Robert A. Cohen, Rodney M. Zerbe, Dec-hert Price & Rhoads, New York City, for defendant.

## OPINION

GOETTEL, District Judge.

This breach of contract case arises from a decision by defendant Lucas Industries, Inc. not to invest in a program, which was developed by plaintiffs Retrofit Partners I, L.P. ("Retrofit") and Advanced Executive Aircraft, Inc. ("AEA"), to retrofit turbo jet engines on Dassault Falcon 20 aircraft. Pursuant to Federal Rule of Civil Procedure 56, defendant moves for summary judgment. For the reasons discussed below, defendant's motion (**Document # 47**) is GRANTED.

## BACKGROUND

The following facts are taken from the parties' revised Local Rule 9(c) Statements.[1]

Plaintiff AEA was incorporated under Delaware law, and Thomas M. Donegan is AEA's sole shareholder. Plaintiff Retrofit was formed as a Delaware limited partnership. Retrofit's sole general partner is AEA, and its sole limited partner is Donegan.

Defendant Lucas Industries, Inc. is the U.S. subsidiary of a publicly held United Kingdom corporation involved in the international manufacture, sale, and service of, among other things, aerospace and automotive products. Lucas Industries, Inc. is a corporation duly organized and existing under Michigan law. At all times relevant to this action, its principal place of business was in Virginia. Lucas Aerospace, Inc., which was a wholly-owned subsidiary of Lucas Industries, Inc., was incorporated under Michigan law with its principal place of business in California. It merged into Lucas Industries effective December 31, 1993. Additionally, at all times relevant to

1. On June 29, 1998, this Court ordered the parties to submit revised Local Rule 9(c) Statements in an effort to narrow the factual issues in dispute. For purposes of this opinion, we cite to these revised Statements as "Plaintiffs' Response" (doc. no. 65) and "Defendant's Response" (doc. no. 66).

this action, Lucas Aviation, Inc. was a wholly-owned subsidiary of Lucas Aerospace. For purposes of this opinion, we refer to the Lucas entities collectively as "Lucas." [2]

From 1966 to 1983, Dassault Aviation ("Dassault") manufactured a corporate jet, called the Falcon 20, which was equipped with two General Electric engines. In 1986, Garrett Airline Services ("Garrett"), together with Dassault, launched a program to re-engine the Falcon 20 using an engine manufactured by Garrett. The retrofitted aircraft were ready for delivery starting in June 1989. Another company, Volpar, Inc. ("Volpar"), announced a competing program in June 1989 for re-engining the Falcon 20 using two Pratt & Whitney Canada ("P & WC") 305 engines.

Beginning in 1990, Donegan also sought to promote a program for re-engining the Falcon 20. Donegan had been a consultant for Volpar's president for several years, but Donegan stopped participating in Volpar's re-engining program in October 1989 at the request of new shareholders. Similar to the Volpar program, Donegan proposed retrofitting the Falcon 20 with two P & WC 305 engines, and thus he named his program the Vantage 305 program.

Before Donegan could actually begin the retrofitting project, he was required to secure two Supplemental Type Certificates ("STCs") from the Federal Aviation Administration ("FAA"). The STCs would allow Falcon 20 aircraft to be re-engined, and they would also permit the retrofitted aircraft to operate with U.S. registry. Donegan entered into a contract with Aerotest, Inc. ("Aerotest"), dated October 1, 1990, pursuant to which Aerotest agreed to perform the engineering and development work necessary to obtain the STCs. Def.'s Ex. 24. Aerotest anticipated that the approval process would take approximately eighteen months.

To finance the Vantage 305 program, Donegan engaged the investment banking firm of Kidder, Peabody & Company ("Kidder") on October 19, 1990. Def.'s Ex. 26. The goal was to raise $12 million in capital through a private placement of limited partnership interests in Retrofit. See Kidder's Offering Memorandum dated 7/6/92 (the "Offering Memorandum"), Def.'s Ex. 47. Kidder, however, never received a binding commitment from any prospective investors. Dissatisfied with Kidder's efforts, Donegan himself wrote "hundreds of letters" to potential investors in late 1991. Yet, Donegan was also unable to obtain any investors.

On September 2, 1992 Aerotest, through its President and Chief Executive Officer Robert Laidlaw, notified Donegan that it considered itself not to be bound by the October 1990 letter agreement. See Def.'s Ex. 51. Retrofit had never made any payments to Aerotest under the terms of the October 1990 letter agreement. Aerotest therefore asserted that the agreement never became effective. Def.'s Ex. 53. Accordingly, Aerotest had never performed any engineering subcontracting work for the Vantage 305 program. As of August 29, 1992, neither Retrofit nor AEA had obtained an STC for re-engining the Falcon 20 aircraft. Consequently, Donegan began looking for someone to replace Aerotest because Aerotest had indicated it was not going to participate in the Vantage 305 program in the future. Donegan therefore needed "a development agency that [he] could depend on" for the program's technical and engineering components. Donegan Dep. at 762–63.

## I. The 1992 Confidentiality and Non–Circumvention Agreement

In early September 1992, Donegan met with Charles Corradi, Lucas' then-Vice President of Business Development, to dis-

---

**2.** Indeed, in plaintiffs' complaint, the Lucas entities are referred to together as "Lucas."

Compl. ¶ 5.

cuss the possibility of Lucas participating in the Vantage 305 program in some capacity, either by providing engineering services (i.e. taking over Aerotest's role), by investing in the program, or both. *Id.* at 171–72, 238; Pls.' Response ¶ 42. None of the parties, however, contemplated that Lucas would become a limited partner of Retrofit. Donegan Dep. at 237–38, 364, 367–68, 598–99; Corradi Dep. at 51–53. Donegan then submitted to Corradi a Confidentiality and Non–Circumvention Agreement (the "1992 Agreement"), which he had drafted himself without any legal assistance. On September 4, 1992, Corradi signed the agreement on Lucas' behalf without making any revisions. Def.'s Ex. 50. Under the terms of the agreement, Lucas would receive the Offering Memorandum and other proprietary information in order to evaluate its investment interest in Retrofit and to consider providing engineering and other technical services relating to the Vantage 305 program.

Meanwhile, Donegan was also speaking to representatives at Dalfort Aviation ("Dalfort") about the possibility of Dalfort purchasing the Vantage 305 program. Donegan Dep. at 150, 161–62, 272, 365–66. According to Donegan, Dalfort had expressed an interest in becoming the program's leader, but Dalfort did not have any technical development capability. Thus, Dalfort wanted to discuss with Lucas the possibility of Lucas taking over Aerotest's role as the provider of engineering services. *Id.* at 161. In October 1992, there was a meeting at Lucas' facility in Santa Barbara, California regarding Lucas' qualifications for supplying engineering and technical services to the Vantage 305 program. The meeting attendees included Donegan; William Ashworth, Lucas' then-Vice President of Engineering and Quality Assurance; Robert Griswell, Lucas' Vice President and General Manager; Joe Gullion, Dalfort's Chief Operating Officer; and a marketing representative from P & WC. *Id.* at 172–75, 315–16, 325; Ashworth Dep. at 21–22. Lucas subsequently submitted a proposal to Dalfort in November 1992 pursuant to which Lucas would provide engineering services to Dalfort in the event that Dalfort acquired the Vantage 305 program. Pls.' Ex. 7. According to plaintiffs, the proposal was satisfactory to them, Pls.' Response ¶ 58, and Donegan testified that "it was the best one I've ever seen." Donegan Dep. at 177.

Ultimately, however, Dalfort withdrew from the Vantage 305 program. Due to unrelated pending litigation between a Dalfort shareholder (the Pritzker family) and P & WC's Connecticut affiliate, P & WC did not want to do business with Dalfort and declined to offer Dalfort a draft engine purchase agreement. Donegan Dep. at 152–54; Def.'s Exs. 55, 60; *see* Def.'s Ex. 54, at 2. All parties agree that Lucas was not responsible for the Vantage 305 program's failure to proceed in 1992.

## II. The 1993 Consultant Agreement

In early 1993, plaintiffs faced the prospect of continuing the Vantage 305 program without Dalfort's involvement. Lucas, however, was still interested in participating in a re-engining program. Griswell Dep. at 37, 40. Consequently, in February 1993, Donegan and Lucas representatives began discussing a possible acquisition of the program by Lucas. Pls.' Ex. 8; Def.'s Ex. 62; *see* Def.'s Ex. 71, at 2. In a February 25, 1993 letter from Donegan to Ashworth, Donegan stated that he was currently "in a position to consider Lucas stepping into Dalfort's position and moving forward.... The important thing to keep in focus is that under this scenario the Vantage 305 Falcon 20 program will become a Lucas Aviation project under your direction and control." Pls.' Ex. 8, at 1–2; Def.'s Ex. 62, at 1–2. Thus, it was contemplated that under this new approach Lucas would take over the entire program by stepping into Dalfort's shoes. Donegan would then be hired as a consultant. Donegan Dep. at 181–82, 364.

Over the next several months, the parties met numerous times to discuss issues surrounding the Vantage 305 program. *See* Pls.' Ex. 10 (reviewing late-May 1993 strategic planning meeting); Pls.' Ex. 11 (describing June 2, 1993 meeting with Donegan and representatives from Lucas and P & WC); Donegan Dep. at 411 (testifying about a June 1993 meeting between P & WC and Lucas at the Paris Air Show); Pls.' Ex. 13 (outlining report of June 15, 1993 meeting in Paris); Pls.' Ex. 15 (summarizing June 29, 1993 meeting in Montreal among Lucas and P & WC representatives regarding technical issues, a market survey evaluation, and airplane performance projections). After a meeting on July 19, 1993 without Donegan, Lucas and P & WC representatives agreed to an eight-week work-sharing effort. Pls.' Ex. 17. They agreed to equally share the cost of conducting a market survey to substantiate then-current market projections as to the number of aircraft available for re-engining. They further agreed to split the cost of performing several technical product development studies to confirm cost and schedule estimates. *Id.* Finally, they set September 14 as the deadline for finalizing investment strategies and assessing cost, schedule, technical, and market risk. *Id.* at 2.

Donegan had also been meeting with Lucas representatives to finalize an agreement between Lucas and AEA pursuant to which Donegan would be paid a consulting fee of $17,000.00 per month in exchange for performing various marketing services. Def.'s Ex. 67. The parties signed this agreement on July 28, 1993 (the "Consultant Agreement" or the "1993 Agreement"), but it was effective as of June 1, 1993. According to Donegan, the parties intended the Consultant Agreement to be an interim agreement which would be in place while Lucas evaluated the Vantage 305 program. Donegan Dep. at 389, 391. Beginning in August 1993, there were discussions among Donegan and Lucas representatives about the terms of a long-term relationship between Donegan and Lucas.

Griswell Dep. at 91–94; *see* Pls.' Exs. 23, 31; Def.'s Exs. 68, 69, 70, 72. Nevertheless, the Consultant Agreement remained in place until Lucas formally terminated it in March 1994. In total, Donegan received $170,000.00 in consulting fees under this agreement. Def.'s Ex. 80; *see* Donegan Dep. at 353 (testifying that Lucas had "honored all their financial obligations under the consulting agreement").

## III. Defendant's Decision Not to Invest

Between September 1993 and January 1994, representatives from Lucas and P & WC met several times to review the feasibility of the Vantage 305 program. *See* Pls.' Ex. 28 (describing a September 15, 1993 meeting); Pls.' Ex. 34 (reviewing a December 7, 1993 meeting); Pls.' Ex. 41 (summarizing a January 14, 1994 meeting). During these discussions the parties considered a report, commissioned by P & WC, prepared by the Arvai Group in September 1993 on the Market Potential for Falcon 20 Re–Engining with the P & WC 305 engines. Pls.' Ex. 26. They also discussed issues relating to a marketing plan, a business plan, and technical evaluations. Pls.' Exs. 27, 28, 34. As of December 10, 1993, Lucas and P & WC targeted December 15, 1993 as the date for finalizing the Falcon 20 Re-engining Program Agreement (to be executed by Lucas and P & WC). Pls.' Ex. 34, at 2. They also wanted to complete the modification program by the end of 1995 due to market pressures. *Id.* Drafts of the Falcon 20 Program Agreement were circulated in mid-December 1993, Pls.' Exs. 38, 35, and P & WC executed it on December 21, 1993. Pls.' Ex. 36.

Yet, some issues were still unresolved, such as Lucas' exposure to technical risk and its concern about the potential market for Falcon 20 conversions, and thus required further negotiations. *See* Pls.' Ex. 41. At a January 17, 1994 meeting, Lucas and P & WC "agreed to reconvene in the last week of January to review and agree

on new terms acceptable to both parties or cancel the program." *Id.* at 2. In a memorandum dated February 8, 1994, P & WC recommended to Lucas that they should not proceed with the program. Pls.' Ex. 42; Def.'s Ex. 75. Then, on February 22, 1994 David Bundred, Lucas' Managing Director of Engine Systems and Customer Support, wrote to Donegan that "Lucas and [P & WC] have jointly decided that we shall not be proceeding with the project and therefore it is with considerable regret that we have had to give you formal notice of this position. I obviously personally regret that at the end of the day the deal simply did not make economic sense." Pls.' Ex. 45; Def.'s Ex. 76. Lucas formally terminated the 1993 Consultant Agreement on March 30, 1994. Def.'s Ex. 79.

On July 29, 1996, plaintiffs brought this suit in Connecticut Superior Court (Judicial District of Litchfield) which defendant then removed to this Court. The five-count complaint alleges breach of the 1992 Agreement for defendant's failure to timely determine whether it would invest or participate in the Vantage 305 program, for Lucas' disclosure to P & WC of the terms of Donegan's compensation under the 1993 Agreement, and for Lucas' failure to obtain Retrofit's prior approval before it entered into agreements with organizations with which Retrofit had existing contracts. Plaintiffs also assert claims for breach of the implied covenant of good faith and fair dealing, misrepresentation, and a violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen.Stat. §§ 42–110a to 42–110q.

### DISCUSSION

Defendant now moves for summary judgment on all counts of plaintiffs' complaint.

### I. Summary Judgment Standard

A court may grant summary judgment only if it determines that there is no genuine issue of material fact based on a review of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). When ruling on a summary judgment motion, a court must construe the facts in a light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If there is no genuine issue of material fact, the moving party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

■ We find that the issues presented in this case are appropriate for determination by summary judgment because the legal construction of a contract is a matter of law for a court. *Dotolo v. Petrucelli,* 152 Conn. 654, 656, 211 A.2d 696, 697 (1965); *see Gianetti v. Norwalk Hosp.,* 211 Conn. 51, 58 n. 6, 557 A.2d 1249, 1252 (1989) (suggesting that "the existence of a contractual relationship may be a mixed question of fact and law"); *Randolph Constr. Co. v. Kings East Corp.,* 165 Conn. 269, 277, 334 A.2d 464, 468 (1973) (stating that "[w]hether a contract exists is a question of fact for the court to determine").

### II. Breach of Contract (Count One)

In Count One, plaintiffs argue that Lucas breached the 1992 Agreement by failing to timely decide whether it would invest or participate in the Vantage 305 program. Plaintiffs assert that the 1992 Agreement obligated Lucas to make these decisions, and that there was an implied duty to do so within a reasonable time. They further contend that Lucas breached the 1992 Agreement because it was un-

reasonable for Lucas to wait seventeen months before reaching a final decision.

Defendant emphasizes that it was not obligated under the 1992 Agreement to actually invest in Retrofit. This is true, and plaintiffs do not dispute this. In pertinent part, the 1992 Agreement provides that AEA, Retrofit, and Kidder

> will provide proprietary information including an Offering Memorandum prepared by Kidder, to Lucas Aerospace, in connection with the consideration of a possible investment by it in Retrofit Partners (the "Transaction"). The materials and information (including those defined below) will be provided to you exclusively for the purpose of evaluating your investment interest in Retrofit Partners and to consider providing engineering and other technical services relating to our Vantage 305 re-engining program for the Falcon 20 aircraft.

Def.'s Ex. 50, at 1. This is the only language in the 1992 Agreement addressing the possibility of Lucas investing or participating in the Vantage 305 program. The remainder of the agreement relates to treating plaintiffs' proprietary information confidentially, not circumventing Retrofit on a re-engining program, not disclosing any discussions or negotiations on the "Transaction," returning confidential material, and not competing with Retrofit's contractual commitments with other persons or organizations. Contrary to plaintiffs, defendant argues that the above-quoted language does not create a binding obligation for Lucas to decide whether to invest in Retrofit or participate in the Vantage 305 program by providing engineering and other technical services.

■ We begin with the basic premise of contract law that no contract can be formed unless there is an offer and acceptance, based on the parties' mutual understanding. *Bridgeport Pipe Eng'g Co. v. DeMatteo Constr. Co.*, 159 Conn. 242, 249, 268 A.2d 391, 394 (1970). To establish their version of the contract, plaintiffs must prove that there was a meeting of the minds. *Id.* at 246, 268 A.2d at 393. Thus, we must decide whether the 1992 Agreement contained an offer which, if accepted, would obligate Lucas to decide whether to invest or provide engineering and other technical services to the Vantage 305 program.

■ The term "offer" means a "manifestation of willingness to enter into a bargain, which would justify another person [in] understanding that his assent to that bargain is invited and will conclude it." *Kieffer v. Danaher, Tedford, Lagnese & Neal, P.C.*, No. 26–81–78, 1990 WL 265725, at *10 (Conn.Super. Dec.20, 1990) (citing Restatement (Second) of Contracts § 24). We find that the language in the 1992 Agreement did not constitute an offer because it did not set forth the specific terms of the deal. *See* E. Allan Farnsworth, *Contracts* § 3.10, at 139 (2d ed.1990) (stating that the "fact that a proposal is very detailed suggests that it is an offer, while omission of many terms suggests that it is not"). "[I]t is generally true that an offer must contain the complete terms of the proposed contract so that its unqualified acceptance will definitely fix the rights of the parties...." *P. Berry & Sons, Inc. v. Western Union Tel. Co.*, 109 Conn. 371, 375, 146 A. 501, 502 (1929).

■ Here, however, the 1992 Agreement did not specify the engineering or technical services required by the Vantage 305 program. According to Ashworth, the proposal given to Dalfort by Lucas in November 1992 "was only an estimate based on very preliminary information that existed at the time." Ashworth Dep. at 28. Indeed, Ashworth testified that the Offering Memorandum *"was of no value"* in the preparation of the November 1992 engineering proposal. *Id.* at 42–43 (emphasis added).

Moreover, the 1992 Agreement did not state the amount of the investment sought by plaintiffs, the form the investment would take, or whether Lucas would simply be an investor or would take a more

active role in running the Vantage 305 program. While the 1992 Agreement refers to the offering Memorandum, all parties agree that they did not contemplate Lucas becoming a limited partner of Retrofit, and thus Lucas would not be held to the terms of the Offering Memorandum. Indeed, Donegan provided Lucas with an old version of the Offering Memorandum, Pls.' Ex. 6, which included Aerotest in the development plans, in order for Lucas to understand Aerotest's proposed role as Lucas would be considering taking over that role. Donegan Dep. at 170–71. Consequently, we find that the deal could not have concluded with Lucas' mere acceptance because the 1992 Agreement did not provide enough information on the deal's terms to have permitted Lucas to have made a decision. *See Pavliscak v. Bridgeport Hosp.,* 48 Conn.App. 580, 596, 711 A.2d 747, 755 (stating that a "contractual promise cannot be created by plucking phrases out of context; there must be a meeting of the minds between the parties") (citations and internal quotations omitted), *cert. denied,* 245 Conn. 911, 718 A.2d 17 (1998).

In determining whether plaintiffs made an offer, we consider the context of the parties' negotiations. *See R.E. Crummer & Co. v. Nuveen,* 147 F.2d 3 (7th Cir.1945) (discussing the importance of context in resolving whether an offer was made); *Jaybe Constr. Co. v. Beco, Inc.,* 3 Conn.Cir. Ct. 406, 409–10, 216 A.2d 208, 211 (App. Div.1965) (considering the "nature of the particular acts or conduct and the surrounding circumstances" to determine whether a certain communication is an operative offer or an inoperative step in the preliminary negotiations). After reviewing the excerpts of deposition transcripts and the numerous exhibits submitted by the parties, we conclude that the language in the 1992 Agreement was not an offer, but rather was an invitation to Lucas to make an offer for a possible investment in Retrofit, for providing engineering services for the Vantage 305 program, or both. We further find that the 1992 Agreement was

executed at the beginning of the parties' preliminary negotiations because there is evidence suggesting that the parties knew further negotiations were necessary before reaching a final agreement, especially considering the withdrawal of Aerotest and Dalfort from the program.

Corradi's testimony underscores that no decision could be made on the basis of the materials, such as the Offering Memorandum, provided to Lucas in connection with the 1992 Agreement. For example, Corradi described Lucas' approach to the Vantage 305 program as "let's take a look at it, let's do the due diligence required to understand if it's a real opportunity, and we'll let you know. That meeting out there was sort of a, hi, how you doing, here's an opportunity, thanks very much for your interest and we'll take a look at it, see ya." Corradi Dep. at 24. With respect his understanding of the 1992 Agreement, he testified, "that it's a confidentiality agreement, it's a non-circumvention agreement. It's a please hurry up and decide agreement...." *Id.* at 25. Yet, he also testified that

> basically this was an opportunity which we [Lucas] had no previous knowledge of. The Vantage 305 program or the Falcon jet, itself, was not an aircraft that was familiar to Lucas, we made no parts on it. What we did was, we agreed with Mr. Donegan that it looked like a potential opportunity. He had showed us some market study and said that, you know, hey, there's this many aircraft in the world, if you retrofit so many of them you could sell them for this, and therefore it makes sense. Okay, we'll take a look at it. Basically, for me, personally, it looked like an opportunity for Lucas Aviation.

*Id.* at 25–26. Indeed, Corradi's understanding was that before Lucas decided what form its investment might take, it wanted to "decide if there's a program to invest in first." *Id.* at 52. Accordingly, Lucas would "do the due diligence re-

quired to understand if it's a real opportunity." *Id.* at 24.

The deposition testimony also indicates the parties' understanding that Lucas would be required to submit a proposal to Dalfort on providing engineering services. For example, Ashworth testified that "[t]he initial intention was that Lucas Aviation engineering would provide engineering design and certification support to the Dalfort organization, who was our customer—who would have been our customer had the program been initiated." Ashworth Dep. at 26. He further testified that Lucas "proposed an engineering and modification program in which we sold to Dalfort an engineering package. That would have included FAA certification." *Id.* at 27. Additionally, Corradi testified that he understood the 1992 Agreement to require Lucas to do a study "that gave a go or a no-go for Lucas' participation in this program." Corradi Dep. at 26–27; *see id.* at 40, 54. Corradi resigned from Lucas before the end of 1992, but his understanding was that the engineering study for which Lucas was "on the clock" had been completed. *Id.* at 111.

Lucas' understanding, as demonstrated by Ashworth's and Corradi's testimony, is confirmed by Donegan's testimony and the events following the execution of the 1992 Agreement. Donegan testified that at his first meeting with Corradi he explained Dalfort's proposed role as the program's leader. Donegan Dep. at 161. After Lucas returned the executed 1992 Agreement, Donegan testified that the next step was for representatives from Lucas, Dalfort, and P & WC to meet in order for Dalfort to review Lucas' qualifications. *Id.* at 172. The outcome of the meeting was that Lucas would present a proposal to Dalfort "of what they would envision their role and how they'd approach it, spell it out, as close as you can, this is your chance to tell us how you'd do it, what's it going to cost, and so forth." *Id.* at 175. Lucas submitted such a proposal to Dalfort on November 13, 1992. Pls.' Ex. 7.

Based on the parties' understanding that Dalfort would review this proposal, we find it proper to characterize Lucas' November proposal as an offer which Dalfort could then accept or reject. (The parties agree that neither Dalfort nor plaintiffs requested Lucas to undertake any of the work outlined in the proposal. Pls.' Response ¶ 59.). Consequently, we conclude that plaintiffs did not make a positive offer in the 1992 Agreement when they stated that they were giving Lucas proprietary information for the purpose of Lucas considering whether to provide engineering and other technical services to the Vantage 305 program. *See* Restatement (Second) of Contracts § 26 (1981) (stating that a "manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent"). Rather, plaintiffs were inviting Lucas to make an offer by submitting a proposal on engineering services to Dalfort.

We also find that Donegan had invited Lucas to offer a proposal to plaintiffs on Lucas' investment interest in Retrofit. When Lucas signed the 1992 Agreement, representatives at Lucas were aware of Dalfort's proposed role as the financial backer of the Vantage 305 program. Donegan testified that Corradi asked, " 'Well, who's going to finance it?' " Donegan Dep. at 161. He responded that "[r]ight now we're talking to Dalfort Aviation about being the home for this. I don't have an agreement with them just yet that's been signed, but they've indicated interest in taking this on . . . ." *Id.* According to Donegan, Dalfort was very clear that it would only participate in the Vantage 305 if it could acquire and control the program. He testified that Dalfort's position was "if we acquire [the] program, we own it, we control the use of our money, has our name, we make all management decisions." *Id.* at 366. In that environment, it seems unlikely that Lucas could

have had an investment interest in the program at that time.[3]

Yet, Donegan testified that if Lucas had any interest in participating beyond simply providing engineering services, someone should "talk to Dalfort, talk to me, whatever your other interests is (sic). Right now I'm free, if you tell me you want to take it all over, I'd be happy to talk to you at this point. There's no deal signed." *Id.* at 162. At the very least, the circumstances surrounding the 1992 Agreement demonstrate that plaintiffs were inviting Lucas to begin negotiations on Lucas' investment interest. "If the language indicates merely an intent to open negotiations which will ultimately result in a contract, or to call forth an offer in legal form from the other party it does not constitute an offer." *P. Berry & Sons,* 109 Conn. at 374, 146 A. at 502. Moreover, "preliminary negotiations as to the terms of an agreement do not constitute a contract." *Jaybe Constr.,* 3 Conn.Cir.Ct. at 409, 216 A.2d at 211; *see Chrysler Capital Corp. v. Southeast Hotel Properties Ltd. Partnership,* 697 F.Supp. 794, 798 (S.D.N.Y.1988) (stating that "enforceable legal rights do not arise from contract negotiations until both parties consent to be bound or, in any event, manifest that consent to each other"), *aff'd,* 888 F.2d 1376 (2d Cir.1989).

The conclusion that the parties were engaged in preliminary negotiations is strengthened once Dalfort decided not to proceed with the Vantage 305 program. At that point, Donegan was at square-one with respect to finding a primary financial supporter of the program. For example, on February 25, 1993 Donegan wrote to Ashworth at Lucas in order to confirm a meeting in early March 1993 about discussing Lucas' interest in acquiring the entire program. Def.'s Ex. 62. In re-

sponse to that meeting, Griswell wrote to Donegan that Lucas

> appreciates the opportunity to review with [sic?] possible participation in the Falcon 20 Re-engine. Your detailed information concerning the program will allow us to carefully evaluate and present to our corporate management team the program. As you are fully aware, we must conduct a careful due diligence on all aspects of the program, and until such time, Lucas Aerospace will not permit us to make any commitments. We realize your eagerness to establish a home for this program, however we request your patience until such time that we can make a decision.

Def.'s Ex. 64.

As further evidence that the 1992 Agreement did not contain a contractual obligation for Lucas to evaluate its interest in investing or participating in the Vantage 305 program, we consider the 1993 Consultant Agreement. Plaintiffs contend that the 1993 Agreement is "irrelevant" to the issue of whether Lucas had an obligation to timely decide whether to invest in Retrofit or provide engineering services to the program. Pls.' Mem. at 24. Conversely, defendant asserts that the 1993 Agreement contains an express contractual provision allowing Lucas to walk away from the negotiations without incurring liability. The Consultant Agreement sets forth two alternative ways of terminating the agreement. First, section 4.1 provides that "[a]t such time the decision is made by Lucas for a full Program to go ahead, this Agreement will terminate and be replaced by a mutually agreed to Agreement." Def.'s Ex. 67, § 4.1, at 3. Second, section 4.2 provides that "[t]his Consultant Agreement will terminate upon any decision by Lucas not to proceed with the Program and no other obligations will exist." *Id.*

**3.** The following exchange occurred at Donegan's deposition:

> Q. Did anyone at Lucas during this Autumn '92 time period indicate to you that you should not go forward with Dalfort because

Lucas was interested in being the entity which invested in this program?

> A. No, sir.

Donegan Dep. at 383.

§ 4.2, at 3. The term "Program" is defined as "a re-engining program for all models of Falcon–20 aircraft." *Id.* at 1.

We find that it is necessary to consider the 1992 and 1993 Agreements together, rather than reading the 1992 Agreement in a vacuum. *See Orange Improvements Partnership v. Cardo, Inc.,* 984 F.Supp. 85, 92 (D.Conn.1997) (stating that "if there are multiple writings regarding the same transaction, the writings should be considered together to determine the parties' intent"). We disagree with defendant that the 1993 Agreement was a novation of the 1992 Agreement. Yet, the 1993 Agreement is evidence that the parties were involved in preliminary negotiations and that no agreement had been reached on any terms of the ultimate deal. The preamble of the 1993 Agreement also reflects the changed status of Lucas' role in the program. It states that Lucas has "the prerequisite experience and unique capabilities to perform work in the areas of development, design, certification, integration and manufacture." Def.'s Ex. 67, at 1. Accordingly, Lucas would no longer simply be a provider of engineering services, but would now undertake leading the entire Vantage 305 program, which therefore required additional and different due diligence than that conducted previously.

In sum, we grant summary judgment to defendant on Count One because we find as a matter of law that the language in the 1992 Agreement was a proposal which fell short of being an offer. By providing proprietary information to Lucas, plaintiffs were indicating their general expression of a willingness to enter into a bargain with Lucas. Yet, by the language of the 1992 Agreement and the subsequent conduct of the parties, we conclude that plaintiffs did not make a positive offer themselves, but were inviting Lucas to make an offer. Because these preliminary negotiations were not binding on the parties, Lucas cannot be subjected to liability based on the length of time it took to complete its due diligence of the Vantage 305 program.

## III. Breach of Contract (Count Two)

For reasons similar to those just discussed, we find that plaintiffs cannot sustain a breach of contract claim in Count Two based on defendant's failure to make a decision to invest or provide engineering services within a reasonable time. In Count Two, however, plaintiffs raise several other bases for a breach of contract claim.

### A. Disclosure to P & WC of Donegan's Compensation Package

■ Plaintiffs argue that defendant breached the 1992 Agreement by disclosing to P & WC the financial arrangements and terms of Donegan's and AEA's proposed future compensation (separate and apart from the 1993 Consultant Agreement). The 1992 Agreement defines "Confidential Evaluation Material" as proprietary information, including the Offering Memorandum, "together with analyses, compilations, studies, contracts or documents, prepared during the review of Retrofit Partners and the Vantage 305 program by you and your associates, including but not limited to your directors, officers, agents, attorney's (sic), employees, accountants, co-investors, contractors, shareholders, advisors, or representatives (collectively 'Representatives')." Def.'s Ex. 50, at 1. The section of the 1992 Agreement on confidentiality provides that:

As a condition to our and Kidder furnishing such information to you, we are requiring that Lucas Aerospace and any related or affiliated party, treat confidentially such information that we furnish to you.... You agree that the Confidential Evaluation Material is the sole and exclusive property of Retrofit Partners and you agree that it will be kept confidential by you and any Representatives as herein required: provided, however, that (i) any of the Confidential Evaluation Material may be disclosed to Representatives of Lucas Aerospace who need to know such information for

the purpose of evaluating the Transaction (it being expressly understood that such Representatives (1) shall be informed by Lucas Aerospace of the confidential nature of the Confidential Evaluation Material, (2) agree to be bound by the terms and conditions of this Agreement and (3) you will be responsible for any breach of this agreement by such Representatives), and (ii) any disclosure of such information may be made to which Retrofit Partners consents in writing.

*Id.* at 1–2. The agreement further provides that "[w]ithout the prior written consent of Retrofit Partners, you agree that you will not, and will direct your Representatives not to disclose to any person that discussions or negotiations are taking place concerning the transactions, including the status thereof." *Id.* at 2.

Plaintiffs assert that Lucas breached these provisions based on a facsimile dated August 16, 1993 sent by Bundred to Carmen Lloyd, P & WC's Vice President of Marketing and Customer Support. Pls.' Ex. 23. Bundred's cover memo states "[f]urther to our recent conversation concerning Volpar and Tom Donegan, I attach a self-explanatory update from Lucas Aviation to myself." *Id.* at 2. The attachment is an internal Lucas memorandum prepared by Griswell and sent to Bundred, and is titled "Falcon 20 Briefing Paper, Notes from Bill Ashworth." The memo first addresses a potential legal claim by Volpar against Lucas based on Lucas' research and review of Volpar assets. It then summarizes Donegan's position on compensating him for his involvement with the Vantage 305 program. For example, the memo states that:

> Advanced Executive Aircraft (Tom Donegan) claims ownership of various development studies and financial analysis

necessary to the successful implementation of this program.... Donegan has requested $2.5 million dollars for the rights to "his" program and 7% of sales as a royalty. Because Lucas recognizes some sales and marketing value in Donegan's [sic] participation, Lucas Aviation evaluated his assets and proposed a $642,000 cash payment and a 1% sales commission. Donegan rejected this offer, hinted at legal action and stated that he would take "his" program to another mod[ification] center. Based on Donegan's stated liabilities and past inconsistent behavior we believe he will conform. Lucas' proposal offers Donegan a $1.6 million dollar net profit after 7 years and 70 aircraft modifications.

*Id.* at 3. As a result of this disclosure, plaintiffs claim that Donegan's position was undercut and that his reputation and relationship with P & WC were adversely affected. Plaintiffs further contend that the disclosure adversely affected Donegan's ability to enter into a separate agreement with P & WC at arm's length or to negotiate another position with P & WC. *See* Donegan Dep. at 376, 617.

As a matter of law, we find that there was no breach of the confidentiality provisions of the 1992 Agreement because the transmittal of the information falls within an exception. Specifically, once Dalfort decided not to participate as the financial backer of the Vantage 305 program, Lucas proposed alternate arrangements including a possible agreement with P & WC to fund the program's development costs. Under this scenario, P & WC is properly considered one of Lucas' "Representatives" as a "co-investor" who was entitled to the information for the purpose of evaluating the program. *See* Def.'s Ex. 50, at 1–2. P & WC then became bound by the terms of the 1992 Agreement.[4] An August 5, 1993

---

4. Indeed, P & WC and Lucas entered into a Reciprocal Disclosure Agreement dated October 12, 1993 pursuant to which they agreed to disclose to each other "[a]ll technical and commercial information relating to P & WC and Lucas products and programs with third parties" for the purpose of discussing "possible risk sharing business arrangements between the two companies." Def.'s Ex. 73, at

internal P & WC memo confirms P & WC's status as a co-investor. The memo states that "Lucas has expressed that they are unable to fund a Falcon 20 re-engining program alone and that they will be dependent on P & WC and possibly 3rd party financing." Pls.' Ex. 18, at 1. Additionally, Griswell testified that P & WC "was willing to put up a substantial amount of money, in the neighborhood of 6 million dollars" in exchange for being "repaid through profits earned from the sale of aircraft." Griswell Dep. at 156.

The evidence conclusively establishes that Donegan was aware of the negotiations for a long-term relationship between Lucas and P & WC, and he knew of P & WC's financial interest in the Vantage 305 program, thus making P & WC a "representative" as that term is defined in the 1992 Agreement, with whom Lucas could share this information. After Dalfort's withdrawal, one of the first meetings among Donegan and representatives from Lucas and P & WC took place on June 2, 1993. *See* Pls.'s Ex. 11. P & WC was briefed on Lucas' review of the Vantage 305 program and Lucas' capabilities to undertake such a program. Donegan "spoke to the importance of a larger and stronger relationship being established between the two companies." *Id.* at 1. Lucas then expressed its desire to establish a risk-sharing business relationship with P & WC based on the expected $15 million in expenditures that would be required to launch the Vantage 305 program. *Id.* at 2.

On June 15, 1993, representatives from Lucas and P & WC met in Paris, France to further discuss the Falcon 20 re-engining program. Bundred summarized the matters arising from the discussion, such as: "[t]he principle of a P & WC investment in the programme proportional to their potential revenue is not in dispute;" "[Bundred] gave P & WC a ball-park figure of $15m for the STC and said that as they gained two-thirds of the revenue, their investment would be about $10m;"

and "[b]oth parties agreed that an updated independent market survey was a necessary precondition of investment." Pls.' Ex. 13, at 1. Most importantly, Bundred stated that, "We agreed that the next step was for Lucas to openly share with P & WC our market research, technical evaluations and business plan." *Id.* at 2.

While it does not appear that Donegan attended the June 15 meeting, he was in Paris and met with P & WC after the meeting "to measure their response to the meeting." Pls.' Ex. 14, at 1. In a follow-up letter to Griswell dated June 20, 1993, Donegan expressed his support for a "single special relationship" between Lucas and P & WC. *Id.* at 1. He also conveyed to Griswell that one of P & WC's concerns was "the amount of money that Lucas asked them to commit. . . ." *Id.* at 2. Moreover, he stated that P & WC "informed me that they were promised a copy of the Lucas business plan. . . ." *Id.* Donegan also referred to himself as being part of the negotiations for a "risk-sharing venture" between Lucas and P & WC. He stated that "[w]ith regard to risk sharing, it is much easier to use creative financing that accomplishes our goals than to demand a check be written." *Id.* at 3. Finally, he recommended to Griswell that Lucas and he prepare financial data to show P & WC. *Id.* at 2. At a subsequent meeting on June 29, 1993 in Montreal, Canada, which Donegan attended, Lucas advised that before it could make a decision about whether to proceed with the program, it wanted to enter into a risk-sharing agreement with P & WC. Pls.' Ex. 15, at 2.

The following evidence also supports P & WC's financial interest in the Vantage 305 program: (1) a July 23, 1993 letter from Ashworth to Richard Dussault, P & WC's Senior Marketing Account Manager, describing the eight-week work sharing agreement between Lucas and P & WC pursuant to which the parties agreed to share the estimated $300,000 cost, Pls.' Ex.

---

1. The companies further agreed to regard the shared information as confidential. *Id.* at 2.

17; (2) an August 2, 1993 internal Lucas memo stating that P & WC had agreed to fund "25% of the $20m cost" of launching the Vantage 305 program, Pls.' Ex. 16, at 3; (3) a September 3, 1993 briefing paper, prepared by Dussault, summarizing the program's non-recurring costs ($11,919,000 for Lucas and $3,075,000 for P & WC) and describing the business arrangement between Lucas and P & WC, Pls.' Ex. 19; (4) a February 8, 1994 letter from P & WC to Lucas recommending that they not proceed with the program, in which P & WC reviews some of the reasons for its decision, including the fact that "Lucas, U.K., will apparently only accept a 'no-risk' position from Lucas Aviation towards this program in the first year ... Essentially, that means P & WC has to finance the first year of operation, i.e., they could walk away any time in the first year and not have to reimburse the grant." Def.'s Ex. 75, at 1; see Griswell Dep. at 157 (testifying as to his understanding of P & WC's position on reimbursing the grant).

Based on P & WC's financial participation in the Vantage 305 program after Dalfort withdrew, it comes as no surprise that Lucas sent P & WC information on the terms of Donegan's proposed compensation. P & WC had already received in-depth financial data on the program and had agreed to share the cost of conducting a market survey and several technical product development studies. Moreover, the financial arrangements among Lucas, P & WC, and plaintiffs were intertwined because each party's position affected that of the others. For example, the amount Lucas paid in royalties to P & WC and Donegan would affect Lucas' rate of return. P & WC realized this ripple effect when it stated in its February 8, 1994 letter that the "rate of return for Lucas is very low (2%) once all the marketing fees, commissions, and the P & WC royalty are taken into consideration. Lucas require

[sic] ... a minimum rate of return of 25% considering the program risk factors. We would have to reduce our royalty by approx. $3 mil. to achieve this end." Def.'s Ex. 75, at 1-2. Accordingly, we conclude that P & WC was Lucas' co-investor, and as such was considered a Lucas "representative" under the terms of the 1992 Agreement. P & WC was therefore entitled to receive financial information, including the terms of Donegan's proposed compensation package, for the purpose of evaluating its investment interest in the Vantage 305 program. Consequently, Lucas did not breach the confidentiality clause of the 1992 Agreement by Bundred's August 16, 1993 facsimile.

## B. Circumvention

Plaintiffs next claim that Lucas breached the 1992 Agreement by entering "into substantial business arrangements with organizations that Retrofit had contracts with, but it failed to secure the prior approval of Retrofit." Compl. ¶ 33(c), at 9. Plaintiffs further contend that "the [1992 Agreement] barred Lucas from contracting with those who had a 'contractual services commitment' with Retrofit." Pls.' Mem. at 35. Specifically, plaintiffs argue that Lucas breached the non-circumvention provisions by leasing an aircraft hanger to Aerotest,[5] and by entering into a Strategic Business Agreement with P & WC. In pertinent part, the 1992 Agreement states that:

> Without the prior written consent of Retrofit Partners you will not for a period of two (2) years beginning on the date of written notification to Retrofit Partners of your intent with regard to the proposed Transaction contemplated herein, directly solicit for employment or contractual services, or enter into any other significant business relationship, with any person or organization who has

---

5. Lucas leased a vacant hangar to Aerotest sometime between November and December 1993.

or has had a contractual services commitment with Retrofit Partners.

Def.'s Ex. 50, at 2.

Although we have serious doubts about the enforceability of this clause, we nevertheless consider the merits of plaintiffs' claims. We first address the alliance between Lucas and P & WC. As discussed in great length in the preceding section, we find that Donegan was not only aware of the negotiations between Lucas and P & WC, but was instrumental in arranging the meetings between the two companies. Moreover, there is no dispute that after the Vantage 305 program fell apart, Lucas and P & WC never participated in a re-engining program together.

As to the relationship between Lucas and Aerotest, we find that there was no breach of the non-circumvention provisions because there was never an effective contract or contractual services commitment between Retrofit and Aerotest. Retrofit and Aerotest entered into an agreement on October 1, 1990. Def.'s Ex. 24. Under the terms of that agreement, Aerotest agreed to perform certain engineering and development work in order to obtain FAA approval in the form of two STCs. Paragraph 2(f) provides that Retrofit was required to make an initial payment of $350,-000.00 to Aerotest. *Id.* at 5. Paragraph 11(m) further provides that "[t]his Agreement shall become effective and Aerotest shall start work upon payment of initial $350,000 funding (See 2(f))." *Id.* at 12. Finally, paragraph 11(n) states that "[i]f this Agreement has not become effective by 31 March 1991 then it shall have no further force and effect unless extended by both parties in writing." *Id.* Plaintiffs admit that Retrofit never made any payment under paragraph 2(f) of the agreement. Aerotest subsequently notified Donegan, both in person and in writing, that according to it the agreement expired without

ever becoming effective because Aerotest never received the required $350,000 payment from Retrofit. Def.'s Ex. 53.

Before the non-circumvention provision of the 1992 Agreement can be triggered, plaintiffs must establish that there was either a contract or a contractual services commitment between Retrofit and Aerotest. Both the terms "contract" and "contractual services commitment" presume the existence of a valid and enforceable agreement. Because the October 1990 agreement never became effective, we find that Lucas did not breach the non-circumvention clause of the 1992 Agreement by leasing a hangar to Aerotest. Consequently, we grant summary judgment to defendant on the claims raised in Count Two.[6]

## IV. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count Three)

■ Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing is based on the length of time Lucas took in conclusively deciding not to invest in Retrofit or participate in the Vantage 305 program. Plaintiffs contend that Lucas did not act in good faith in discharging its duties under the 1992 Agreement, and they specifically assert that this is a contract-based claim rather than a tort-based claim. "Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Habetz v. Condon*, 224 Conn. 231, 238, 618 A.2d 501, 505 (1992). Because, as we held above, Lucas did not have an obligation under the 1992 Agreement to decide whether to invest in Retrofit or participate in the Vantage 305 program, there can be no liability for breach of the

---

6. In their opposition memorandum, plaintiffs attempt to raise a claim for breach of the 1992 Agreement based on Lucas' alleged failure to return to Retrofit "all of the information that Lucas developed in the course of its review of the program, and in other respects." Pls.' Mem. at 35. Even under a liberal reading of the complaint, we find that plaintiffs did not raise this as a claim in the complaint. Accordingly, we disregard it.

implied duty of good faith and fair dealing. Thus, we grant summary judgment to defendant on Count Three.

## V. Misrepresentation (Count Four)

To support their claim for misrepresentation, plaintiffs assert that Lucas "repeatedly, intentionally or recklessly misrepresented to plaintiffs its actual intentions with respect to the Vantage 305 program. In fact, Lucas used the pretense of participation in the Vantage 305 program as a means to have Donegan initiate contact between its representatives and P & WC, which Lucas used to lead to other cooperative ventures with P & WC and from which Donegan was excluded." Compl. ¶ 31, at 10. They further state that they "relied on Lucas' misrepresentations in breaking off discussions with other entities which were interested in becoming involved with the Vantage 305 program." *Id.* ¶ 32, at 10.

■■■ One of the elements of a *prima facie* case of fraudulent misrepresentation which plaintiffs must prove is reasonable reliance. *Billington v. Billington,* 220 Conn. 212, 217, 595 A.2d 1377, 1379 (1991). Here, plaintiffs cannot prove that they relied to their detriment on any statements by Lucas employees that Lucas would affirmatively proceed with the Vantage 305 program because any alleged oral misrepresentations *contradict the parties'* contractual obligations. First, the 1992 Agreement did not bind plaintiffs to proceed ˌexclusively with Lucas. Donegan Dep. at 312, 386, 646–47; Pls.' Response ¶ 52. Instead, they were free to pursue other investors or other entities interested in participating in the Vantage 305 program. Then, once the parties executed the 1993 Agreement, Lucas was given the contractual right to decline to participate in the program without incurring any liability. Def.'s Ex. 67 § 4.2, at 3 (stating that "[t]his Consultant Agreement will terminate upon any decision by Lucas not to proceed with the Program and no other obligations will exist."). Because these contracts contradict any oral promises made during the parties' preliminary nego-

tiations, we find that these alleged oral promises cannot be the basis of a claim for fraudulent misrepresentation. *Flight Concepts Ltd. Partnership v. Boeing Co.,* 38 F.3d 1152, 1157 (10th Cir.1994). Thus, we grant summary judgment to defendant on Count Four.

## VI. CUTPA Violation (Count Five)

■■■ Plaintiff's CUTPA claim merely incorporates by reference their breach of contract claims. As the Second Circuit held in *Boulevard Associates v. Sovereign Hotels, Inc.,* 72 F.3d 1029, 1038–39 (2d Cir.1995), "[w]e agree with ... the vast majority of courts in Connecticut that a simple contract breach is not sufficient to establish a violation of CUTPA, particularly where the count alleging CUTPA simply incorporates by reference the breach of contract claim and does not set forth how or in what respect the defendant's activities are either immoral, unethical, unscrupulous or offensive to public policy." Some Connecticut courts have allowed a CUTPA claim to stand when a plaintiff also establishes claims for misrepresentation or breach of the implied covenant of good faith and fair dealing. *See Stanley Works v. Waxman Indus., Inc.,* Civ. No. 89–594, 1990 WL 484228, at *2 (D.Conn. Mar.19, 1990); *CNF Constructors, Inc. v. Culligan Water Conditioning Co.,* Civ. No. 92–0242302S, 1993 WL 360671, at *1 (Conn.Super. Sept.9, 1993). Here, however, we have already dismissed these claims. Thus, the only basis for plaintiff's CUTPA claim is a breach of contract which is not enough. We therefore grant summary judgment to defendant on Count Five.

## CONCLUSION

For the foregoing reasons, defendant's summary judgment motion **(Document # 47)** is GRANTED.

**SO ORDERED.**